**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **4:24-cr-00543** |
| | § | |
| **BRADLEY RICKENBACKER** | § | |

**MOTION TO SUPPRESS EVIDENCE DERIVED FROM**
**CELL TOWER DUMP WARRANT AND FLOCK ALPR SURVEILLANCE**

TO THE HONORABLE KEITH ELLISON:

Defendant Bradley Rickenbacker, by and through undersigned counsel, moves under the Fourth Amendment to the United States Constitution and Federal Rule of Criminal Procedure 12(b)(3)(C) to suppress all evidence obtained directly or indirectly from (1) the cell tower dump search warrant authorizing the seizure of device and location data for cellular towers serving Bimboz Bar (No. 4:24-mc-5498), and (2) the Government's warrantless use of the Flock Safety automated license plate reader system and the search warrants derived from it, and respectfully shows the Court as follows.

## I.  INTRODUCTION

On March 7, 2024, a federal task force officer obtained a single warrant compelling AT&T, Verizon, Sprint, and T-Mobile to disclose identifying and location data for every cellular device that connected to any tower serving Bimboz Bar during a three-hour window on February 23, 2023. The warrant named no device, no telephone number, and no account to be seized. It authorized a mass seizure of the location data of every person

present near a public bar, and reserved to law enforcement the after-the-fact task of deciding which devices were "relevant." That is a modern general warrant.

The affidavit acknowledges that the dragnet was unnecessary. The affiant swore that law enforcement would "search these records for the identified cellular phone numbers of Bandidos members and Bandidos' support club members." Ex. A (Lyons Aff.) ¶ 22. In other words, the Government already possessed the telephone numbers it sought to place at the scene. It had attributed Mr. Rickenbacker's number, (346) 528-9279, to him no later than October 19, 2023, nearly five months before the dump, through a search warrant executed on a co-defendant's phone. Rather than seek targeted historical location data for those known numbers, the ordinary and particularized investigative step would have been for the Government to seize everyone's data and reverse-match. The Government has since sworn that the dump "shows that phones believed to be operated by ... RICKENBACKER ... were in the area of Bimboz the night of the assault and robbery." Gov't Aff., Bates USA-133414 ¶ 25.

The Supreme Court's recent decision confirms that this was a search. In *Chatrie* v. *United States*, 609 U.S. ___, No. 25-112 (June 29, 2026), the Court held that "[a]n individual has a reasonable expectation of privacy in records about his cell phone's location" and that police conduct a Fourth Amendment search when they demand that information from a third-party technology company. Slip op. at 1, 6. *Chatrie* expressly left it to the lower courts to determine whether the warrant satisfied the Fourth Amendment's particularity and probable cause requirements at each stage of the search process. *Id*. at 19-20.   Fifth Circuit precedent separately holds that geofence warrants are "general warrants

categorically prohibited by the Fourth Amendment." *United States v. Smith*, 110 F.4th 817, 838 (5th Cir. 2024).

## II.  FACTUAL BACKGROUND

### A.  The Bimboz Bar Cell Tower Dump Warrant.

On February 23, 2023, members of the Bandidos Motorcycle Club allegedly assaulted and stole cuts from members of the Greybeards Motorcycle Club at Bimboz Bar, 10634 Cossey Road, Houston, Texas. Lyons Aff. ¶¶ 9–10. More than a year later, on March 7, 2024, Task Force Officer Joshua D. Lyons applied for and obtained a tower dump warrant, which was sworn before United States Magistrate Judge Christina A. Bryan. The warrant directed AT&T, Verizon, Sprint, and T-Mobile to disclose records for "[a]ll cell towers operated or controlled by" each carrier "that provided cellular service to 10634 Cossey Rd, Houston, Texas 77070" on February 23, 2023, from 7:00 p.m. to 10:00 p.m. CST.   For every device that connected to those towers during that window, the warrant compelled disclosure of unique identifiers, source and destination numbers, the date, time, and duration of each communication, the cell tower and sector that handled it, and the type of communication. *Id.* ¶¶ 19–20. The affidavit acknowledged that these records "will identify the cellular devices that were in the vicinity of Bimboz Bar ... prior to the assault and robbery and at the time the assault and robbery occurred." *Id.* ¶ 21. The warrant identified no suspect device, telephone number, or account, required no minimization before disclosure, and imposed no meaningful limit on the Government's review or retention of the data.

**B. The Government Had Already Identified Mr. Rickenbacker and His Telephone Number.**

The affidavit itself names Mr. Rickenbacker, by name and alias, as one of the Bandidos members for whom the affiant asserted probable cause: "Bradley Rickenbacker a/k/a Dolla Bill." Ex. A (Lyons Aff.) ¶¶ 5, 17. The Government had attributed his telephone number to him well before it sought the dump. Discovery produced by the Government reflects that the number (346) 528-9279, saved as "Dolla Bill," was attributed to Mr. Rickenbacker no later than October 19, 2023, when agents executed a search warrant on the cellular telephone of Stephen Alms and found the number stored as "Bandido Dolla Bill WTH." *See* Gov't Disclosure, Bates USA-116319; *see also* FBI Form FD-302, Bates USA-002270 (listing "Dolla Bill: 346-528-9279 ... confirmed Bandidos member Bradley Rickenbacker"). The Government thus possessed Mr. Rickenbacker's number nearly five months before it applied for the Bimboz dump.

**C. The Affidavit Admits, and the Returns Confirm, a Reverse Match Dragnet.**

The affidavit does not describe a graduated, anonymized protocol. It describes a one-step dragnet followed by reverse matching against numbers the Government already held. The affiant swore that he and his partners would "search these records for the identified cellular phone numbers of Bandidos members and Bandidos' support club members." Ex. A (Lyons Aff.) ¶ 22.

The returns confirm the method. After the carriers produced the data, Task Force Officer Lyons "began an exhaustive review searching for numbers that had been collected

over this long-term investigation into the Bandidos," and reported that he identified "thirty-three (33) Bandidos suspects present at Bimboz, 32 by name and number and 1 by just number." FBI Form FD-302, Bates USA-095289. The Government thus seized the data of every device that connected to the towers serving a public bar, then sorted that universe against its preexisting roster of numbers to decide who was "relevant."

**D.  The Dump Located Mr. Rickenbacker's Device and Placed Him at the Scene.**

The Government has stated that the dump, with respect to Mr. Rickenbacker, did precisely what it was designed to do. In a later affidavit, the affiant stated that "[a] cellular tower dump pursuant to a federal search warrant shows that phones believed to be operated by [Pfeffer], RICKENBACKER, [Sanchez], and Alms were in the area of Bimboz the night of the assault and robbery." Gov't Aff., Bates USA-133414 ¶ 25. Investigators separately reported recognizing Mr. Rickenbacker in the bar's surveillance video. See FBI Form FD-302, Bates USA-095289. The Government has further represented that the location data was critical because much of the assault occurred outside the camera's view. The seizure of Mr. Rickenbacker's location data and the resulting placement of his device at the scene are direct fruits of the warrant.

**E.  The Intervening Decision in *Chatrie*.**

On June 29, 2026, the Supreme Court decided *Chatrie v. United States*, holding that the compelled acquisition of cell phone location data is a Fourth Amendment search. Because *Chatrie* is the controlling and intervening authority on the threshold question, Mr. Rickenbacker brings this motion.

### III.  MR. RICKENBACKER HAS STANDING

A defendant may challenge a search in which he had a legitimate expectation of privacy. *Katz v. United States*, 389 U.S. 347, 351 (1967). *Chatrie* holds that "[a]n individual has a reasonable expectation of privacy in records about his cell phone's location." 609 U.S. ___, slip op. at 1, 6. Mr. Rickenbacker had that expectation in the location records obtained through the Bimboz tower-dump warrant. This is not a matter of inference. The Government has sworn that the dump "shows that phones believed to be operated by ... RICKENBACKER ... were in the area of Bimboz the night of the assault and robbery." Gov't Aff., Bates USA-133414 ¶ 25. His device data was therefore among the data the warrant compelled and the Government reviewed, and the compelled seizure of that data itself is the Fourth Amendment injury. *See Carpenter v. United States*, 585 U.S. 296, 310 (2018). Mr. Rickenbacker has standing to challenge the warrant.

### IV.  ARGUMENT

#### A.  *Chatrie* Establishes That the Tower Dump Was a Search and Forecloses the Threshold Defenses.

The acquisition of historical cell-phone location information is a Fourth Amendment search. *Chatrie* so held, explaining that everything Carpenter relied on to find a search in the CSLI context applies "as well or better" to Location History data. 609 U.S. ___, slip op. at 11-13. *Chatrie* also rejects a third-party-doctrine defense because such data is "not truly shared as one normally understands the term." Id. at 15-17 (quoting Carpenter, 585 U.S. at 315). And the brevity of the three-hour window does not defeat Fourth

Amendment protection, because even short-term monitoring can reveal highly private detail and, where the Fourth Amendment applies, it applies regardless of the quality or quantity of information obtained. *Id.* at 13-15 (*quoting United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring), and *Kyllo v. United States*, 533 U.S. 27, 37 (2001)).

**B.  The Warrant Was an Unconstitutional General Warrant.**

With the threshold settled, the remaining questions are whether the warrant satisfied the Fourth Amendment's particularity and probable-cause requirements. *Chatrie*, 609 U.S. ___, slip op. at 19-20. The Fifth Circuit has already resolved them for reverse location warrants. In *Smith*, the court held that such warrants "permit searches of vast quantities of private, personal information without identifying any particular suspects or demonstrating probable cause," and concluded: "[W]e hold that geofence warrants are general warrants categorically prohibited by the Fourth Amendment." 110 F.4th at 834, 838. *Smith*'s holding turns on the reverse location structure, search first and narrow later, not on the identity of the database. The Bimboz dump shares that structure and exceeds it: it captured every device that registered with any tower serving a public bar, swept in every uninvolved patron and passerby, and left identification to the Government's own unconstrained matching of thirty-three numbers against the whole. That is "the exact sort of general, exploratory rummaging" the Fourth Amendment forbids. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

**C.  The Warrant Lacked Particularity.**

Particularity must attach to the persons or things to be seized, not merely to the database to be searched. The warrant named no person, device, telephone number, or account. It imposed no minimization requirement and no limits on the Government's review or retention of the data. Instead, it compelled disclosure of all devices and all associated metadata, followed by unrestricted Government review to select "relevant" phones. That is no particularity at all, and it is the very defect condemned in *Smith*.

**D.  The Warrant Lacked Probable Cause as to the Universe of Devices and as to Each Provider.**

Probable cause must be stated in the warrant. The affidavit established, at most, that some Bandidos members were present at a public bar. It articulated no reason to believe that *every* device connecting to the surrounding towers belonged to a participant. Mere presence near a crime is not probable cause. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). The warrant is independently defective because it commanded four separate carriers to produce data without probable cause that any particular carrier held evidence of the offense. A warrant requires probable cause that evidence will be found in the place to be searched. Demanding records from every major carrier, in the hope that one holds relevant data, is the digital analog of searching every bank in the county for the proceeds of a crime.

**E.  The tower dump's fruits, including the later warrants that relied on it, must be suppressed.**

Suppression extends not only to the tower dump records themselves but also to all evidence the Government derived from them. Evidence obtained by exploiting an unlawful search must be suppressed unless the taint has "become so attenuated as to dissipate." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). The Government did not let the Bimboz dump sit; it built the dump results into the probable cause for a series of later search warrants in this investigation.

The October 28, 2024 affidavit of FBI Task Force Officer Keith Koncir, submitted in support of a series of premises warrants (Nos. 4:24-mc-7166 through 7177), is a case in point. At paragraph 32, the affiant swore that the March 7, 2024 warrant "authoriz[ed] a cellular tower dump of the area of Bimboz Bar at the time of the assault and robbery," and that the returned records "revealed" telephone numbers associated with Bandidos members who "were in the vicinity of Bimboz Bar at the time of the assault." Oct. 2024 Koncir Aff. ¶ 32 (Bates USA-132904). The tainted dump thus supplied the location evidence tying the charged enterprise to the Bimboz assault, which in turn supported the later warrants and the evidence seized under them.

Indeed, a single warrant shows how the Government fused two separate unlawful searches into one probable cause showing. The amended affidavit for TARGET RESIDENCE #1, 20323 Avery Point Drive, Katy (No. 4:24-mc-7166, Bates USA-132831), rests both on the Bimboz tower dump, Amended Koncir Aff. ¶ 32, and on the warrantless Flock captures addressed in Part VI, id. ¶¶ 78–79, 84, 93, 96. Where a warrant depends on two independent Fourth Amendment violations, excising the fruits of each

leaves the affidavit that much barer, and the good faith exception correspondingly harder to sustain.

Every warrant and every item of evidence that depended on the Bimboz dump is fruit of that unconstitutional general warrant and must be suppressed to the extent it was used against Mr. Rickenbacker. That single October 28, 2024 Koncir affidavit supported twelve warrants, Nos. 4:24-mc-7166 through 7177, each resting on the same probable cause showing that incorporated both the Bimboz tower dump (Koncir Aff. ¶ 32) and the warrantless Flock captures (id. ¶¶ 78–96):

    a. No. 4:24-mc-7166 (Attachment A1) — TARGET RESIDENCE #1, 20323 Avery Point Drive, Katy, Texas;

    b. No. 4:24-mc-7167 (Attachment A3) — TARGET RESIDENCE #2, 12800 Briar Forest Drive, Unit 43, Houston, Texas;

    c. No. 4:24-mc-7168 (Attachment A8) — TARGET RESIDENCE #3, 5628 Birchmont Street, Apartment A, Houston, Texas;

    d. No. 4:24-mc-7169 (Attachment A10) — TARGET RESIDENCE #4, 21118 Terrace View Drive, Katy, Texas;

    e. No. 4:24-mc-7170 (Attachment A2) — TARGET VEHICLE #1, a green Harley Davidson motorcycle, Texas plate 922C4L;

    f. No. 4:24-mc-7171 (Attachment A4) — TARGET VEHICLE #2, a black Chevrolet Silverado, Texas plate HPV1128;

    g. No. 4:24-mc-7172 (Attachment A5) — TARGET VEHICLE #3, a black Harley Davidson motorcycle, Texas plate 829T3G;

h. No. 4:24-mc-7173 (Attachment A6) — TARGET VEHICLE #4, a blue Harley Davidson motorcycle, Texas plate 996C4L;

i. No. 4:24-mc-7174 (Attachment A7) — TARGET VEHICLE #5, a black Harley Davidson motorcycle, Texas plate 616B9X;

j. No. 4:24-mc-7175 (Attachment A9) — TARGET VEHICLE #6, a black Harley Davidson, Texas plate 961B9R;

k. No. 4:24-mc-7176 (Attachment A11) — TARGET VEHICLE #7, a black Harley Davidson motorcycle, Texas plate 775A9X; and

l. No. 4:24-mc-7177 (Attachment A12) — TARGET VEHICLE #8, a white Ford F150, Texas plate RXP8972.

Each of these warrants rested on the same tainted showing, and the evidence seized under each is fruit of the unlawful tower dump and of the warrantless Flock surveillance. Any evidence the Government offers against Mr. Rickenbacker; as to those, the fruits of both unlawful searches must be suppressed.

## V.  THE GOOD FAITH EXCEPTION DOES NOT APPLY

The good-faith exception does not save the evidence. Exclusion remains the remedy when a warrant is "so facially deficient ... that the executing officers cannot reasonably presume it to be valid," and when police conduct is "deliberate," "reckless," or "grossly negligent." *United States v. Leon*, 468 U.S. 897, 923 (1984); *Herring v. United States*, 555 U.S. 135, 144 (2009). Three independent reasons defeat good faith here.

**A. The Warrant Was Facially Deficient.**

A warrant that authorizes the seizure of *all* device and location data near a location, while naming no person, device, number, or account, is facially general. By the time this warrant was issued, *Carpenter* had long established that the compelled acquisition of cell-site location information is a search demanding particularized probable cause. *Carpenter*, 585 U.S. at 310–11. No reasonable officer could presume that a warrant authorizing the seizure of every device that touched the towers serving a public bar satisfied that command. In general, all devices warrant of this kind is the paradigm of a warrant too facially deficient to support objectively reasonable reliance. *See Leon*, 468 U.S. at 923.

**B. The Dragnet Was a Deliberate Choice To Seize More Than Probable Cause Supported.**

Good faith also fails because the affidavit shows deliberate overbreadth. The agents already had the targets' telephone numbers, including Mr. Rickenbacker's, which had been attributed to him since October 19, 2023, and they swore they would simply "search these records for the identified cellular phone numbers." Lyons Aff. ¶ 22. A particularized and obvious alternative, seeking historical location data for those known numbers, was available and would have produced the same evidence regarding the named targets without seizing the data of every innocent person near the bar. Choosing a suspicionless dragnet instead is precisely the "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights" at which the exclusionary rule is aimed, and against which "the

benefits of exclusion tend to outweigh the costs." *Davis v. United States*, 564 U.S. 229, 238 (2011) (quoting *Herring*, 555 U.S. at 144) (internal quotation marks omitted).

## C. *Davis* **Reliance on Binding Appellate Precedent Is Unavailable.**

The Government may argue good faith because the Fifth Circuit decided *Smith* on August 9, 2024, after the March 7, 2024 warrant. *Davis* is inapposite. It shelters only objectively reasonable reliance on "binding appellate precedent" that "specifically authorize[d]" the challenged conduct. *Davis*, 564 U.S. at 241. No precedent authorized tower dump dragnets in this Circuit in March 2024; *Carpenter* pointed the other way, and the Supreme Court had expressly reserved, not approved, the question of tower dumps. *See Carpenter*, 585 U.S. at 316. *Smith* did not announce a new rule so much as apply settled general warrant principles, and *Chatrie* has since confirmed the constitutional violation. In any event, the good-faith failure here rests on the warrant's facial deficiency and the agents' deliberate overbreadth, not on *Smith*. Because exclusion's deterrent value is at its height against a deliberate, facially general dragnet, the good-faith exception does not apply, and the exclusionary rule controls.[1]

---

[1] Mr. Rickenbacker further reserves the right to challenge the Blue Bayou and Winters Bar tower dump warrants to the extent discovery shows his device data was seized therein.

## VI.  THE WARRANTLESS FLOCK SURVEILLANCE WAS A SEPARATE FOURTH AMENDMENT SEARCH, AND THE WARRANTS THAT RELIED ON IT MUST BE SUPPRESSED

The tower dump was not the only warrantless location surveillance the Government used to build this case. For months in 2024, officers used the Flock Safety automated license plate reader (ALPR) network to compile a retrospective record of Mr. Rickenbacker's movements and associations, and they used that record to help establish probable cause for the warrant to search Mr. Rickenbacker's residence, TARGET RESIDENCE #7, 21727 Cayman Point Drive, Katy, Texas (No. 4:25-mc-5377), one of nine premises warrants supported by the February 18, 2025 affidavit of FBI Task Force Officer Keith Koncir (the "February 2025 Koncir Affidavit"). That surveillance was itself a Fourth Amendment search under *Carpenter* and *Chatrie*, it was conducted without a warrant, and the warrant(s) built upon it are void under *Franks v. Delaware*, 438 U.S. 154 (1978).

### A.  The Flock ALPR surveillance campaign.

Flock Safety operates a network of stationary ALPR cameras that photograph every passing vehicle, capture the rear license plate and a "vehicle fingerprint," and upload each image, along with a timestamp and geographic location, to a searchable, cross-jurisdictional database that authorized officers may query by plate or vehicle characteristics. Beginning in the summer of 2024 and continuing through that winter, officers used the Flock system not to locate a single vehicle in real time but to establish,

over months, the daily patterns of life, vehicle ownership, and claimed gang affiliations of persons the Government identified as Bandidos members, including Mr. Rickenbacker. The captures the Government relied upon include the following:

a.    Darvi Hinojosa. Flock cameras captured Hinojosa riding a green Harley Davidson on October 2 and October 12, 2024. On October 17, 2024, Flock captured him riding the motorcycle while wearing a Bandidos "cut," or vest.

b.    Sean Christison. On July 19, 2024, Flock cameras captured Christison driving a white Ford F150 with Chapter President John Pfeffer in the passenger seat. On October 10, 2024, Flock captured him in the same vehicle while wearing a Bandidos cut.

c.    John Sblendorio. On October 6, 2024, Flock captured Sblendorio riding a black Harley Davidson while wearing a Bandidos cut.

d.    Ruben Moreno. On October 10, 2024, Flock captured Moreno riding a black Harley Davidson while wearing a Bandidos "prospect" cut.

e.    Bradley Rickenbacker, John Pfeffer, Adam Buffalo, and Marcel Lett. A Flock photograph dated December 1, 2024, captured Lett riding alongside Mr. Rickenbacker and Pfeffer. A further Flock photograph on December 25, 2024, captured Pfeffer, Rickenbacker, and Adam Buffalo together, with Pfeffer and Rickenbacker visibly wearing their Bandidos cuts.

These captures did more than read license plates. They are dated, geolocated photographs of the individuals themselves, of the insignia they wore, and of the companions with whom they traveled, and the Government used them to prove association with the Bandidos. The February 2025 Koncir Affidavit relies on two such captures against

Mr. Rickenbacker: a December 1, 2024 Flock image depicting Lett riding with Rickenbacker and Pfeffer, Feb. 2025 Koncir Aff. ¶ 59 (Bates USA-133448), and a December 25, 2024 Flock image depicting Pfeffer and Rickenbacker "riding their motorcycles while wearing their Bandidos cuts," id. ¶ 73 (Bates USA-133455). The October 2024 Koncir Affidavit (Bates USA-132904) separately relied on the Hinojosa, Christison, Sblendorio, and Moreno captures described above. See Oct. 2024 Koncir Aff. ¶¶ 78–79, 84, 93, 96. On the present record, officers obtained no warrant for any of this Flock activity, and the Flock network aggregates and makes searchable the location data collected by numerous other jurisdictions.

**B. The Flock surveillance was a warrantless search under *Carpenter* and *Chatrie*.**

As the analysis of the tower dump already shows, an individual has a reasonable expectation of privacy in all of his physical movements, and the Government conducts a search when it compiles a retrospective record of those movements. *Carpenter*, 585 U.S. at 310–13; *Chatrie*, slip op. at 6. *Chatrie* confirmed that this protection applies "regardless of the quality or quantity of information" obtained, rejecting the argument that a short window of location data falls outside the Fourth Amendment. *Chatrie*, slip op. at 1, 6. The constitutional concern is the aggregation of location data into a retrospective, searchable chronicle, not the number of data points.

The Flock surveillance is squarely within that rule. Officers did not glance at a plate in plain view; they queried a searchable database to reconstruct, at the click of a button, where Mr. Rickenbacker had traveled over a period of months, aggregated across

jurisdictions. The Government cannot escape that conclusion by noting that a plate is publicly visible, for the public character of the movements in *United States v. Jones* did not defeat the search there; what matters is the aggregation of many observations into a comprehensive whole. *Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring in the judgment); *Carpenter*, 585 U.S. at 311–13.

That some district courts have declined to apply *Carpenter* to a brief, one-time ALPR query does not aid the Government. See, e.g., *United States v. Jackson*, No. 24-cr-10010-JWB (D. Kan. May 29, 2025). Those decisions rested on the small quantity of data and the single-day span of the tracking, a rationale *Chatrie* has now rejected, and on the premise that ALPR cameras capture only vehicles and reveal nothing of a person's "familial, political, professional, religious, and sexual associations." *Carpenter*, 585 U.S. at 311. That premise is absent here: the Flock captures are photographs of the members in their cuts, traveling together, offered for the express purpose of proving organizational association. Surveillance deployed to map a person's associations lies at the core of what *Carpenter* protects.

## C. The Flock-derived warrants are void under *Franks*, and their fruits must be suppressed.

Because the Flock surveillance was an unlawful, warrantless search, the affidavit(s) supporting the warrant(s) that relied on it cannot establish probable cause based on that unlawfully obtained information. When the December 25, 2024 Flock image is excised from the February 2025 Koncir Affidavit, little remains, for paragraph 73 establishes Mr.

Rickenbacker's current Bandidos membership and the location of that membership at TARGET RESIDENCE #7, largely on the strength of that image. Feb. 2025 Koncir Aff. ¶ 73. To the extent the warrant for TARGET RESIDENCE #7 depended on the excised Flock image, it must be suppressed.

The affidavit(s) were independently misleading by omission. The affiant presented the Flock captures as proof of association while failing to disclose that the location history was obtained without a warrant and was drawn from a searchable, multi-agency database rather than from direct observation; the affidavit described each image only as a "Flock License Plate Reader" photograph. See Feb. 2025 Koncir Aff. ¶¶ 59, 73. Those omissions were material, for a magistrate apprised of them would have understood that the showing rested on warrantless surveillance and on an inference from vehicle location to organizational association. Supplying the omitted facts defeats probable cause. *Franks*, 438 U.S. at 155–56. At a minimum, Mr. Rickenbacker has made a substantial preliminary showing entitling him to a *Franks* hearing on the Flock-derived warrant(s).

Mr. Rickenbacker has standing to raise this challenge for the reasons stated in Part III and because, as the owner and operator of the tracked vehicle, he retains a reasonable expectation of privacy in his entire physical movements. *Carpenter*, 585 U.S. at 310. All evidence obtained by exploiting the unlawful surveillance and the void warrant(s) must be suppressed as fruit of the poisonous tree. *Wong Sun*, 371 U.S. at 487–88. And for the reasons stated in Part V, the good faith exception cannot rescue a warrant procured through a *Franks* violation or one left "so lacking in indicia of probable cause" once the Flock data is excised. *Leon*, 468 U.S. at 923.

## VII.  THE GOVERNMENT HAS NOT PRODUCED THE GRAND JURY MATERIALS, AND MR. RICKENBACKER RESERVES ALL RELATED CHALLENGES

As of the filing of this motion, the Government has not produced the grand jury transcripts or exhibits that led to Mr. Rickenbacker's indictment. Mr. Rickenbacker therefore cannot yet determine the extent to which the grand jury relied on the Bimboz Bar cell tower dump, the warrantless Flock surveillance, or evidence derived from either in returning the indictment against him. He raises the issue now to preserve it and to place the Court and the Government on notice.

Mr. Rickenbacker reserves the right to supplement this motion and to seek all appropriate relief once the grand jury materials and the full provenance of the Government's evidence are disclosed. The relief he seeks in this motion is the suppression, for all purposes at trial, of the tower dump records, the Flock data and photographs, and all evidence derived from them. However, nothing in this motion should be construed as waiving any further challenge, including any challenge to the indictment, that the grand jury materials may support. Mr. Rickenbacker expressly reserves any such challenge and, upon a showing of particularized need, will seek disclosure of the grand jury materials.

## VIII.  CONCLUSION

The Bimboz Bar cell tower dump authorized a digital dragnet that violated the Fourth Amendment. *Chatrie* confirms it was a search; binding Fifth Circuit precedent confirms it was an unconstitutional general warrant lacking particularity and probable

cause; the Government's own affidavit confirms that Mr. Rickenbacker's device data was seized; and the affidavit's admissions defeat any claim of good faith.

WHEREFORE, Mr. Rickenbacker respectfully requests that the Court hold an evidentiary hearing and, thereafter, suppress all evidence obtained directly or indirectly from the Bimboz Bar cell tower dump warrant, No. 4:24-mc-5498, and from the Government's warrantless Flock surveillance and the search warrants derived from it; order the Government to produce the grand jury transcripts and exhibits that led to Mr. Rickenbacker's indictment; and grant such further relief as the Court deems just and proper.

Respectfully Submitted,

/s/ Michael DeGeurin
Michael DeGeurin
Federal Bar No. 23288
Foreman DeGeurin & DeGeurin
300 Main St. 3rd Floor
Houston, Texas 77002
Telephone No.  (713) 655-9000
Facsimile  No.  (713) 655-1812
Attorney for Bradley Rickenbacker

### CERTIFICATE OF CONFERENCE

The government opposes this Motion to Suppress.

/s/ Michael DeGeurin
Michael DeGeurin

### CERTIFICATE OF SERVICE

On the day of filing, a true and correct copy of this filing was emailed to the Assistant United States Attorney.

/s/ Michael DeGeurin
Michael DeGeurin